**TOLEDO PRESSED STEEL CO. v. MONTGOMERY, WARD & CO.**

**No. 54.**

Circuit Court of Appeals, Second Circuit.

Nov. 7, 1938.

CHASE, Circuit Judge, dissenting.

———◆———

Darby & Darby, of New York City (Samuel E. Darby, Jr., of New York City, and Wilber Owen, of Toledo, Ohio, of counsel), for plaintiff.

Anthony William Deller, of New York City (Carl V. Wisner, Jr., of Chicago, Ill., of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This suit is for infringement of patent No. 1,732,708 granted October 22, 1929, on an application filed December 26, 1928 for a kerosene burning construction torch. Claims 2, 5, 11 and 12 [1] are sued on.

This torch is used as a warning signal on streets to make known obstructions on the highway. The patent states: "This invention relates to street torches, such as are commonly used for illuminating road obstructions, and usually referred to as construction torches, but more particularly to devices for increasing the efficiency of such

---

[1] 2. In a device of the class described, a torch body having an opening for a wick, and a flame guard for said wick mounted on the outside of said torch body, said guard including a cap provided with an imperforate top wall and lateral flame

torches and militating against extinguishment of the torch flame, and an object is to provide a simple and efficient attachment for torches of the above character for increasing the efficiency thereof and materially reducing the liability of extinguishment of the flame by high winds. Another object is to provide a burner so constructed and arranged that liability of extinguishment of the flame by high winds or by rain is reduced to a minimum. * * *"

And further: "* * * It has been found that with the above described construction and arrangement, the oil consumption is materially decreased. It is also found that the amount of wick used is likewise decreased. Another outstanding advantage resides in reducing the liability of extinguishing the flame by high winds or rain."

Oil consumption by the burner of the patent in suit is reduced more than 50% as compared with its predecessor, the open flame torch; wick consumption which was from three-fourths of an inch to an inch and a quarter each night in the open flame torch was practically eliminated. It is undisputed that appellant and appellee's torches now pass all the tests imposed by the State Highway Departments, none of which are passed by the open flame torch. These advantages are obtained by substituting for the burner of the old open flame torch, which was a wick-tube and wick protruding from the container for oil, a burner in which the end of the wick-tube and wick are enclosed in a metal cap provided with suitable air inlets and flame outlets. The cap is supported on a flange which contacts the wick-tube and transmits heat to the wick-tube and wick to maintain the oil above the flash point and provide under all weather conditions a suitable supply of hydrocarbon vapor which escapes from the flame openings in the metal cap and burns outside the cap. Regardless of the effect of wind and rain on the flame outside the burner, the source of the flame inside the burner is protected and continues to supply the hydrocarbon vapor necessary to feed the flame which is the warning signal.

This patent was litigated in the Sixth Circuit where the Circuit Court of Appeals held it to be invalid. Standard Parts, Inc., v. Toledo Pressed Steel Co., 93 F.2d 336. The court below felt obliged to follow that decision.

This record, however, contains evidence absent in the Standard Parts Case, showing that the art was in search for this accomplishment; that others worked unsuccessfully to solve the problem of producing a torch which would not only be more economical in the use of kerosene, but would remain lighted notwithstanding rain and wind. In the Standard Parts Case, it was said that the problem required no inventive thought. The proof here, not found in the Standard Parts Case, showed widely separate unsuccessful attempts to provide some means which would prevent the flame from being extinguished. Unsuccessful efforts were made over a long period by men skilled in the art of burners. The history of the art, as here shown, demonstrates that the accomplishment was not easy nor apparent nor merely the work of one skilled in the art. Hookless Fastener Co. v. G. E. Prentice Mfg. Co., 2 Cir., 68 F.2d 940, 941.

The open flame torch had been in use as a warning signal for many years. The usual type was a sheet metal container with a wick one and a half inches long; the wick was soaked with kerosene and burned from the sides as well as the top. It was referred to as a "bonfire of cotton fibre". High fuel and wick consumption were the consequence. A strong wind would blow the flame away from the wick

openings adapted to emit a luminescent flame, and air ports.

5. In a device of the class described, a construction torch having an opening in its upper end for a wick, means to hold the wick in place, and a guard fitting over the outer end of the wick but spaced from the sides thereof, said guard having an imperforate top wall and side flame and air openings.

11. A burner for a construction torch adapted to emit a luminescent flame and comprising a wick holder having a portion in contact with the wick and a supporting and heat-receiving flange, and means enclosing a space above said flange and surrounding the wick, except for provision for lateral exit of flame and restricted entrance of air for combustion.

12. A burner for a construction torch adapted to emit a luminescent flame and comprising a wick holder having a portion in contact with the wick and lateral flange, and a cap enclosing and spaced from the end of the wick and having an imperforate top and provision for lateral exit of flame and entrance of air, and the bottom of the cap being in heat conducting relation to said flange.

and cool the oil below the flash point, thus causing the flame to go out. If water soaked the wick, it would vaporize and cool the wick below the temperature at which the oil would burn and the flame would go out. Moreover, the flame produced was three or four inches in diameter and sometimes six to eight inches high of irregular shape, flickering and weaving from side to side with changing air currents.

The problem presented was to preserve this open unsteady flame and maintain it under all kinds of weather conditions without enclosing it. By the mechanical combination of parts shown in the patent, the results above referred to as to efficiency and economy were obtained. Kerosene gives off no combustible vapors at ordinary temperature, but must be heated to the flash point which runs up to 150° or 160° F. There is a small protected combustion chamber in the bottom of the cap in both appellant's and appellee's devices, provided with restricted air inlets, so that, when lighted, it has a little chamber where a little air is admitted, and which maintains the temperature of the wick to the point where it will give off vapor. The cap temperature was found on test to run as high as 780°F; the heat from the cap was conducted into the flange and into the tube surrounding the wick, and this heat would supplement the heat from the small flame in the combustion zone and would succeed in maintaining the temperature of the wick tube and the kerosene which would be vaporized and keep the flame going. On tests it was found that high wind velocity did not seem to succeed in elminating the flame or cooling the kerosene as used in both appellant's and appellee's burners. Both acted alike in that respect and both gave high temperature of feed.

That the problem required more than mechanical skill is demonstrated by the efforts and trials of those interested in its solution. The need for the general use of torches became more necessary with the general use of automobiles. The evidence shows that it has been the experience of those using the open flame torch that it blew out or was rained out and there was a real problem of securing a burner which would stand both rain and wind. Unsuccessful attempts have been made by competitors who had been long in the business of manufacturing and selling open flame torches. The results of these experiments were placed upon the market and, until the burner under the patent in suit appeared, they had not solved the problem. When placed on the market, appellant's burner superseded open flame torches. Other manufacturers of sheet metal open flame torches soon abandoned their makes in favor of the patented type. Some competitors took out licenses under the patent; others brought out torches similar to the patented device and in so doing passed the tests prescribed by State Highway Departments for signal devices. It was only after a series of experiments extending over a long period that the inventor here succeeded. It was the protection of the source of the flame from wind and rain by means of the metal guard provided with suitable openings, thus insuring the maintenance of a small portion of the flame in a protected zone and utilizing the heat from this flame and the heat from the metal guard to maintain the temperature of the kerosene in the wick above the flash point which insured a supply of gaseous vapor at all times which would pass outside the guard and thereby provide the open and unprotected flame which formed the warning signal.

The prior art does not disclose or suggest the combination or result here obtained. The patent to Rutz No. 1,101,146, granted June 23, 1914, had for its object "to provide a simple, economical and effective flash igniter for a series of gas stove burners, the same being grouped about the igniter and within the field of entrained jets of flame, which jets are emitted from the igniter under the control of the operator."

This device was used on a kitchen gas range and many of them were sold. The flame they are designed to protect is a small pilot light, which burns continuously and is so feeble that it might be extinguished by indoor drafts, such as the sudden closing of a door. The flame is completely enclosed within the metal cap. The principal function of this cap is materially different from any function of a burner of the patent in suit. The fuel is not the same. Rutz uses gas under pressure. The patentee here uses kerosene which must be vaporized before it will burn and when vaporized is not under pressure. There is the problem of heating the fuel to vaporize it. Rutz makes provision for cooling the cap by providing a substantial space between the pilot light and the cap walls, also by passing a cylinder of air up through the vent open-

ings in the supporting disk and out through vent openings near the top of the cap, whereas in the patent in suit the heat of the cap is utilized to assist in heating the kerosene in the wick above the flash point. In the Rutz patent there is no means for heating the cap if its use there were desirable. The pilot light is small and so far spaced from the cap that no substantial amount of heat will be transmitted to the cap, even in the absence of the rising cylinder of air inside the cap and along its walls. The flame which follows the jets of gas to the stove burners continues for only a fraction of a second and does not impinge upon the walls of the cap.

Heating the cap is very important in the patent in suit, one of its functions being to supply heat to the wick and the oil in the wick tube so as to raise the oil above the flash point. In the Rutz patent there was no problem of fuel or wick consumption, whereas these were important considerations of the patent in suit. Rutz had no problem of maintaining the flame under conditions of wind and rain.

The Russian patent to Malcov, No. 1163 of 1868, is for a lamp burner of special construction. The description is meager and the drawing vague and it is justly so criticized. The specifications refer to two tubes and state that between them "there remains a space into which may enter a third tube called regulator and intended for the adjusting of the size of the flame". Apparently it was intended to use charcoal which would become heated above the flash point of the oil and hydrocarbon vapors and would escape through the small perforations in the dome, where they would mix with the air and burn. The experts called were unable to understand the disclosure of this Russian patent. It does not anticipate the patent in suit.

In Rockwood v. General Fire Extinguisher Co., 2 Cir., 8 F.2d 682, 686, we pointed out that if changes had to be made in the combination cited as in anticipation to make it a successful commercial device, it would not be such prior art as would invalidate a patent. But it is argued that appellant had sought a patent by attempting to obtain a monopoly on a new use for the Rutz structure. It is said that the appellant has attempted to take one element, the guard for the pilot light from the Rutz apparatus, and combine it with a fuel tank wick and wick holder of the prior art in

such a manner as to accomplish to some degree the functions and results of the patent in suit. But the device here used as a warning signal—the burner—must be considered as an entirety, that is, the oil container, the wick, the wick tube and the top. Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823; Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 18 F.2d 66, 68. While torch bodies and flame guards were old, they have never been used together to perform the function or produce the results of the device of the patent in suit. If they were ever combined for any purpose, it was not to protect the flame at its source so as to provide a small protected chamber in which some part of the flame would continue to burn regardless of outside weather conditions, with the greater and visible part of the flame burning as a warning signal outside the guard. This combination and use amounted to invention. Instead of being for a combination of elements whose novelty depends upon an improvement of one of the elements without change of function or result of combination in its entirety, this patent covers a unitary structure patented as an entirety. Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A.,N.S., 653; Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000; Stromberg Motor Devices Co. v. Zenith-Detroit Corp., 2 Cir., 73 F.2d 62.

But defendant says it avoids infringement because in its device the flange which supports the cap is elevated a short distance above the body of the torch and the air inlet openings are located in this supporting flange instead of in the side of the cap. No statement in the claims of specifications requires that the cap rest directly on the body of the torch, nor that the air inlet ports be located in the body of the cap. The patentees state that while they have shown and described the constructions "which admirably fulfill the objects primarily enumerated, it is to be understood that the above description * * * is given by way of illustration and not of limitation."

Claim 2 calls for a "flame guard for said wick mounted on the outside of said torch body, said guard including * * * air ports." In appellee's device the flame guard is mounted on the outside of the

torch body. There is no doubt that the flame guard includes both the cap and its supporting flange and that the flame guard includes air ports.

Claim 5 calls for "a guard fitting over the outer end of the wick * * *, said guard having an imperforate top wall and side flame and air openings". Considering the guard as including both cap and supporting flange, appellee's flare has air openings in the guard at the side of the wick,— an important consideration,—rather than locating them in the side of the cap.

■ The non-infringement of claim 11 is based on the claim that appellee has separated the wick-tube-supporting and heat-receiving portions of the flange of the patent. But this overlooks the rule that infringement cannot be avoided by substituting two parts for a single part of a patented structure when the two parts perform the same function as does the single part of the patent. Arthur Colton Co. v. McKesson & Robbins Inc., 2 Cir., 58 F.2d 157, 158; Line Material Co. v. Brady Electric Mfg. Co., 2 Cir., 7 F.2d 48, 50.

As to claim 12, it is contended that the word "lateral" applies to the location of the air openings and requires that they be in the cap. The air inlets in the supporting flange of the appellee's flare are located laterally with respect to the wick and wick tube, as are the air inlets of appellant's device.

■■ These arguments, as to non-infringement, fail to give effect to the established rules that infringement exists if the substance of the invention which is defined by the claims, as distinguished from its form, is appropriated, and that infringement of a combination claim is not avoided by reason of the fact that the appellee is free to use some or all of the separate elements of the combination because they existed in the prior art. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Winans v. Denmead, 15 How. 330, 56 U.S. 330, 14 L.Ed. 717; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147; Hillard v. Fisher Book Typewriter Co., 2 Cir., 159 F. 439, 442.

On this record we hold that invention has been established and that the appellee's device infringes the claims here sued on.

Decree reversed.

CHASE, Circuit Judge, dissenting without opinion.