## SCHICK DRY SHAVER, Inc., et al. v. R. H. MACY & CO., Inc.
### No. 244.

Circuit Court of Appeals, Second Circuit.
May 13, 1940.

Rehearing Denied June 26, 1940.

See 112 F.2d 1007.

Abraham Tulin, Reginald Hicks, and Samuel Yudell, all of New York City, for plaintiffs-appellees.

Pennie, Davis, Marvin & Edmonds, George E. Middleton, and H. Stanley Mansfield, all of New York City, for defendant-appellant.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal is by defendant, R. H. Macy & Co., Inc., from a decree holding certain patent claims valid and infringed. Sales of the alleged infringing devices by the defendant in the Southern District of New York was proved and is not disputed.

The plaintiff, Schick Dry Shaver, Inc., is a Delaware corporation which is the exclusive licensee of the two patents in suit.

The patents are owned by the other plaintiff, Schick Industries, Ltd., a corporation organized under the laws of the Bahama Islands, B. W. I. They are No. 1,721,530 which was granted to Jacob Schick for a Shaving Implement on July 23, 1929 on his application filed March 21, 1928; and No. 1,759,978 granted to the same patentee for a Shaving Machine on his application filed April 23, 1928. Claims 13, 14, 15, 16, 17, 19 and 20 of No. 1,721,530 were held valid and the five claims first mentioned were held infringed by what is known as the third model of the accused shaver sold by the defendant. Claim 1 of No. 1,759,978 was held valid and infringed by the same device.

Patent No. 1,721,530, which is the principal patent in suit in the sense that the other patent relates to improvements, disclosed the distinctive cutting head of what has become known as the Schick dry shaver. It embodies what should be given the credit for having produced the change in dry shaver cutting head construction which brought about the change in the reciprocating cutter bar type of dry shaver necessary to spread the closest cutting, which had before been confined to the edges of the shaving head, throughout the area of the shear plate.

Schick's outstanding advance in this art may be traced to the disclosure of an end shear plate of uniform thickness; having parallel slots extending from side to side; against the entire underside of which a cutter bar having similar slots was made to move rapidly back and forth to cut the hairs which came between the cutting edges and to the plane of which, but no further, the hair bearing skin was pressed into the slots. In doing this, Schick supposed he needed to use a shear-plate so thin that it would flex in operation and that support against undue flexing must be provided. He utilized the cutter bar to give such support and made much of that feature in his specifications and claims. That is not, however, of much importance on this appeal. The real contribution of Schick to this art was to give his shaving head the ability to shave with equal closeness throughout the entire cutting area. That must constantly be kept in mind both to give to his invention the patentable breadth it deserves and prevent an unwarranted extension of it.

It should now help to explain that Schick was by no means the first to disclose an electrically operated dry shaver and that

what he did was to take advantage, as had not been done before, of a few simple facts. If a metal plate fitted with parallel slots of uniform width throughout is pressed against the skin of the face, the skin will puff out into the slots more or less, within limits, dependent upon the pressure and, disregarding any variation in the texture of the skin, will enter each slot to the same extent. The extent of such slot entrance of the skin, equally within limits, is also dependent upon the width of the slot openings. Consequently, if slot openings are made which will upon pressure permit some skin to puff out into them, uniform slot openings will under the same pressure each receive skin to the same extent. If, therefore, it is desired to have the skin enter the slots to the level of the backside of the shear-plate in which they are put, simply cut them through a plate, making them all alike, of metal of such uniform thickness that the vertical sides of the slots will let the skin fill in as desired while the slots are made too narrow to permit it to go farther. Additional thickness in the shear-plate requires additional width in the slots or a beveling of the slot sides to accomplish the same result. Schick did not state the substance of the above in his specifications. What he did disclose was the construction of a shaving head which worked well because what has just been said is so.

Before Schick there had been no commercially successful dry shaver. But such instruments had been made and patented. They may roughly be divided into those having revolving cutters which so differ from the Schick construction that they may, for present purposes be ignored, and those having reciprocating cutter bars of the general nature of that of Schick. These dry shavers were really modified hair clippers. They are exemplified in this record by a British patent No. 753 granted to Appleyard in 1914 and a French patent No. 613,873 granted to Fourniols in 1926.[1] Appleyard disclosed a dry shaver having two outwardly facing cutting edges somewhat like those of a Gillette safety razor. Each cutting edge was formed by a toothed face-plate which would be pressed against the user's face; a toothed reciprocating cutter bar placed underneath the face-plate and tightly held to its undersurface while it was actuated back and forth rapidly by an electric motor so as to cut off the hairs which entered between the teeth of the face-plate and the cutter; and a guard or comb held a short distance away from the open ends of the cutter bar and face-plate teeth to serve the double purpose of holding the skin out of damaging contact with those ends and of directing the hairs into the spaces between the teeth of the cutting edges. The need for the skin protecting guard was due to the fact that Appleyard made his face-plate taper from a relatively considerable thickness at what may be called the back down to an extremely thin knife edge at the tooth ends. The reciprocating cutter bar underneath was given a somewhat similar taper which made Appleyard's cutting edges obviously dangerous in use if unguarded. Some difference of opinion was developed at the trial as to whether or not Appleyard's construction called for the outer ends of only the theoretical thickness of zero but we find it unnecessary to say more about that. What is of more importance now is the fact that whenever hair was cut with an Appleyard shaver, if any was cut at all, it was inevitable that the closest cutting would be at the tips of the face-plate tooth ends where they were the thinnest. Hair might conceivably enter at other places and if long enough to extend beyond the inner edge of the face-plate would be cut off but unless the distance between the teeth was so great that despite the thickness of the face-plate the skin would puff in between the teeth far enough to bring its surface flush with the plane of the cutter blade there would be left, after the cut, hair so long that it would again be cut if it came within the cutting range of the edges. Nor is that the only, or perhaps the most important, difference between Appleyard and Schick. If such a situation as that above outlined occurred, the Appleyard shaver so constructed with such wide spaces between the teeth would permit the skin at and near the tooth ends to enter the slots so far beyond the width of the thinner part of the teeth there that it would be harmed by being cut or burned. None of the claims in suit were anticipated by Appleyard because, when read in the light of the specifications, they all cover Schick's cutter head with the thin shear-plate of uniform thickness throughout which Appleyard did not disclose.

---

[1] The Fourniols patent was not a part of the prior art in the record in Schick

Dry Shaver v. Dictograph Products Co., 2 Cir., 89 F.2d 643.

Neither are two of Schick's claims in suit anticipated by Fourniols for a different, though kindred, reason. This patent has been criticized because the disclosure is so vague but it is definite enough for present purposes. At most, Fourniols disclosed an electrically operated combination hair clipper and dry shaver. He provided detachable cutting elements and intended to have the desired use determine their selection. His dry shaver, in which we are now alone interested, had its face-plate uniformly thin but there is no adequate proof that the teeth in it were separated by spaces of uniform width as in Appleyard. On the contrary, they are shown not with parallel sides but with slanting ones somewhat like those of saw teeth which gave the openings between the teeth in the face-plate a triangular shape with the base or widest part between the outer ends of the teeth. That left the skin free to enter at or near the outer ends of the teeth farther than it could under the same pressure at or toward the inner ends. There could not, therefore, be present in Fourniols the safe end or area shaving provided by the Schick shaving head and so there was no anticipation by either Appleyard or Fourniols in so far as the Schick claims are expressly or by implication limited to a uniformly thin shear-plate to distinguish from Appleyard or uniformly wide slots piercing the plate to distinguish from Fourniols. From so much it becomes clear that the kind of slots Schick used in the cutting head have to have parallel sides to escape anticipation by Fourniols.

Probably Schick did not realize the importance of this when he filed his specifications. He seems to have been greatly, too greatly perhaps, concerned with his method of preventing the flexing of his very thin shear-plate. However that may be, he certainly did not disclose slots with parallel sides as the only form of shear-plate openings. On the contrary, he said in his specifications, after stating that he had shown his shear-plate as a series of parallel blades, that it "can be provided with openings of other shapes as will be evident but this form is thought to be the easiest and cheapest to make".

Claims in suit, therefore, which are not themselves limited to parallel slots in the shear-plate cannot be so limited by reference to the specifications and are invalid. To that extent they are anticipated by Fourniols. The claims now relied on which are invalid for the above reasons are Nos. 13, 14, 15, 19 and 20. Of these claims, all but No. 13 were added during the Patent Office proceedings after the application had been filed and those do take into account Schick's substantial inventive changes in the shearing head which made possible the area, as distinguished from line, shaving. But even so, there are two reasons why they must with No. 13 be held anticipated by Fourniols. One, of course, is the fact above noted that the specifications were in terms broadened to include shear-plate blades which did not have parallel edges and so might be of varying distances apart; and the other is that claims 16 and 17 in suit are both limited to shear-plate blades having parallel edges and such a limitation in each of these claims is to be contrasted with the lack of it in the others.

Claim 17 reads: "17. A shaving implement comprising, in combination, a shear-plate having a series of parallel spaced blades separated by slots open-ended on at least one side of the shear-plate, said slots being of such a width as to accommodate hair and to maintain the surface of the skin being shaved from extending above the rear surfaces of said blades while permitting it to extend substantially to said rear surfaces along the lengths of said slots as the outer surface of the shear-plate is held flat against the skin, cutter means having edges contracting the rear surface of the shear-plate, and means to operate said cutter means in relation to the shear-plate."

In claim No. 16 the limitation to shear-plate blades parallel to one another is expressed as " * * *, a shear-plate having a series of closely spaced blades adapted to lie in contact with the skin and whose shearing edges are disposed in a direction substantially continuous with the direction of manipulation of the implement during a shaving operation, the blades of the shear-plate being relatively thin and of substantially the same cross-sectional area along their shaving lengths, * * *".

It has been strenuously argued that all of the claims of this patent are invalid because the disclosure rested in vital particulars upon no more certain terms of description of the shear-plate than "thin", "extremely thin", "so thin that it would collapse or flex under inward pressure". It is said that there is no adequate disclosure of what thickness of shear-plate is to be used and also that it is not a good limiting

description to say in respect to the distance between shear-plate blades that they "are too close together, however, to allow the skin to pass up into the slots 14 and the skin is therefore safe from cutting".[2] Also that the distance between such blades may not be given as of the ability to admit hair as a minimum and of the ability to exclude skin from the cutting area as a maximum. Though such argument is, indeed, plausible in the sense that some experimentation would seem to be required in amplification of the disclosure, it must be remembered that in making the cutting head of a dry shaver such distances as those of a hair's breadth are those with which the maker of the shaving head is immediately concerned and it is, perhaps, the exact opposite of vagueness and uncertainty to express such distances in terms of the thickness of hair. At least it may be recalled that to express minute distances in terms of the breadth of a hair is not uncommon. So too, it is fair to say that if one skilled in the art is told to make the blades too close together to permit the skin to pass up into the slots far enough to be in danger of being cut he would know what that meant. The specifications are to be read fairly in connection with the claims and a reasonable construction given the language used to the end that whatever invention is actually disclosed and claimed will be protected. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Keystone Mfg. Co. v. Adams, 151 U.S. 139, 14 S.Ct. 295, 38 L.Ed. 103. When so read the language is as definite as the law requires. These two claims are, therefore, valid.

■■ There is a sharp conflict in the evidence as to infringement. The shaver sold by the defendant which was found to infringe is the so-called third model of a dry shaver made by the Utility Instrument Company. It is one having two shaving edges disposed relatively to each other as were those of the Appleyard shaver. They consist of a toothed face-plate with a toothed cutter bar underneath which bears against the face-plate and is made to reciprocate rapidly by an electric motor suitably connected. These teeth in the face-plate correspond to the blades in the shear-plate of the patent and, as their sides are parallel, they serve with the co-acting parts of the shaver to provide the area shaving of the patented shaver unless they have a substantial taper from the back at the closed ends of the slots between them out to the thin exposed ends where the slots are open-ended. The conflict in the evidence was resolved by the trial judge in favor of the plaintiffs. The decisive finding which is supported by ample, though contradicted, evidence is that the shear-plate blades, or teeth, of the third model of the shaver sold by the defendant "* * * taper from about .008 of an inch in thickness down to .007 over the outward extent of their shearing lengths, * * *". These minute dimensions are not kept absolute in engineering practice in production and it is undisputed that a working tolerance of .001 is to be allowed. Consequently this amount of difference in the thickness of the face-plate teeth, or shear-plate blades, at their ends cannot serve to give them the distinctive taper necessary to bring them within Appleyard. That amount of difference might be due merely to the working tolerance allowable in making a shear-plate of uniform thickness and does not amount to the relatively substantial difference in the thickness of the shear-plate blades at their ends needed to make them conform to Appleyard's construction and hold them beyond the scope of the claims in suit. We do not now undertake to determine how much of a taper in the blades is needed to avoid infringement. It is enough for present purposes that the accused device was proved to have face-plates which, from a practical standpoint, must be held to be of uniform thickness throughout. Though the scope of this patent in view of the prior art is, indeed, narrow this defendant has in the respect pointed out invaded the limited field covered by it. The decree is affirmed as to the validity and infringement of claims 16 and 17. In so far as it applies to patent No. 1,721,530 in other respects, it is reversed.

The second patent, No. 1,757,978, was found below to cover an improvement of the shaver of the first patent which "so far as these suits are concerned, is the provision of side-wall openings or slots opposite the ends of the shear-plate slots through which hair may enter the shear-plate slots without substantial bending at the surface of the skin". The only claim alleged to be infringed is No. 1, which reads as follows: "1. A shaving machine comprising, in combination, a skin contacting plate of nar-

---

[2] Here the context shows that by "slots 14" only the cutting area is meant.

row width with alternate slots and blade (sic) extending widthwise of the plate, the plate being of thin metal, walls supporting the skin contacting plate at the ends of the blades, said walls having openings opposite the slots whereby hair may enter said slots without substantial bending of the hair at the surface of the skin as the shaving implement is passed over the skin in a direction substantially parallel to the slots, cutter means including a plate in contact with the rear surface of the skin contacting plate and having alternate slots and teeth whereby hair in the slots is sheared as said cutter means is translated, and means to translate said cutter means."

This claim was not submitted when the application was filed. In response to Patent Office action, original claims were cancelled and claim No. 1 as above quoted was, with others, added by amendment. There was, however, no supplemental oath. The appellant says truly that nothing was said in the specifications about openings in the side walls opposite the shear-plate slots to enable hair to enter the slots without substantial bending at the surface of the skin. And, in view of that failure so to disclose a material part that is claimed, it insists that claim one is invalid because granted without compliance with Sec. 4892, R.S., 35 U.S. C.A. § 35.

It is well settled that unverified claims for an invention other than that originally described cannot be allowed. Steward v. American Lava Co., 215 U.S. 161, 30 S.Ct. 46, 54 L.Ed. 139. But as this disability does not extend to a new claim whose substantial features were a part of the invention which was described in the specifications which were sworn to, De La Vergne Refrigerating Mach. Co. v. Featherstone, 147 U.S. 209, 13 S.Ct. 283, 37 L.Ed. 138, the appellees attempted to show that the specifications did include the slotted side wall feature in that they contained a description of how to make the shear-plate which would necessarily result in the making of the claimed openings in the side walls. This contention is fortified by pointing to Figs. 4, 5 and 6 in the drawings which accompanied the specifications in which it is said that such side wall openings are shown. The trial judge so found in substance.

The part of the specifications where it is said the side wall slots were disclosed reads: "The shear-plate 14 is very thin and in order to make the thin slots for receiving the hairs and preventing the entrance of the skin the shear-plate is first stamped as shown in Fig. 4, to provide the notches 30. Then the blade is ground off on a suitable plane such as defined by the small line (a) in Figure 4 until the upper end of the cuts forms slots of suitable width as shown in Figure 5. Then the lower face is ground off as shown at (b) in Figure 5 and this forms the completed plate as shown in Figure 6." Figures 4, 5 and 6 which are referred to in the above quotation are all cross-sections of the shear-plate in different stages of manufacture and show nothing more. The judge apparently based his finding upon the theory which a witness attempted to establish to the effect that "Since the notches are deeper than the final thickness of the shear-plate, those notches will leave slots in the side-wall where they were stamped at the same time they were stamped with the rest of the shear-plate." Seemingly, what has just been quoted would be so if the same sort of notches were stamped in the sidewall as in the shear-plate designated in the specifications as 14. But that is pure assumption. The specifications do not teach that or mention it at all and it is obvious that the notches to be stamped need not necessarily extend beyond the shear-plate. Presumably one following the specifications in making the shear-plate would end his notches where the shear-plate ended as it is the shear-plate alone into which it is said that the notches are to be stamped. The contentions made on this subject and the proof offered were, indeed, of such a nature that the trial judge could easily have relied too heavily upon mere assertion. We are forced to the conclusion that he did and that the finding that the oath supported specifications do disclose the slotted sidewall claimed is erroneous. As claim 1 is not, therefore, adequately supported by the specifications, it is held invalid.

Decree modified in accordance with the above without costs in this court to either party.