31 C.C.P.A. (Patents)
## POULSEN et al. v. McDOWELL.
### Patent Appeal No. 4862.

Court of Customs and Patent Appeals.
March 8, 1944.

Rehearing Denied April 27, 1944.

Paul Kolisch, of New York City, for appellants.

Stephen H. Philbin, of New York City, and J. Huff, of Haddon Heights, N. J. (Chester L. Davis, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

Poulsen and Petersen (British Acoustic Films, Limited, assignee), hereinafter for

convenience referred to as Poulsen, have here appealed from the decision of the Board of Interference Examiners of the United States Patent Office awarding to McDowell (Radio-Keith-Orpheum Corporation, assignee) priority of invention as to three counts of the interference, which counts correspond to claims 72, 73, and 74 of the Poulsen application. Those claims were held patentable to Poulsen in a suit under R.S. § 4915, 35 U.S.C. § 63 (1940), 35 U.S.C.A. § 63, against Coe, Commissioner of Patents, by the United States Court of Appeals for the District of Columbia, which reversed the holding of the District Court of the United States for the District of Columbia. Poulsen et al. v. Coe, 73 App.D.C. 324, 119 F.2d 188, 48 U.S. P.Q. 673.

The counts read:

"1. The method of producing a photographic sound record comprising the following steps: directing a light beam onto a moving film so that it receives a transversely disposed extremely narrow strip of light, variably exposing the film in accordance with the amplitude of each individual sound wave, controlling the light impinging on the film to vary the average exposure of the film as the volume of the sound to be recorded varies, *and holding the variations of the average exposure between predetermined lower and upper limits.*

"2. The method according to count 1 and in which the lower limit of the average exposure variation is approximately zero.

"3. The method according to count 1 and in which the upper limit of the average exposure variation is substantially midway between zero and full exposure." (Italics ours.)

The invention defined by the counts relates to sound recording for "talking movies" and is designed to prevent asymmetrical distortion and to eliminate what is known as "ground noise" in the recording of sound waves through the use of a light beam vibrated by a mirror. Each of the parties sought to cut off the peaks of the waves evenly on each side of the so-called zero line when there was "overshooting" of the sound track, so as to prevent distortion, and to black-out or mask the clear, unused portion of the sound track when there was no modulation, so as to eliminate the ground noise.

In the prior art recording systems, sound of great amplitude produced peaks which fell outside the track margins of the space where the sound was to be recorded. During silent periods, only one-half of the sound track was exposed, the other half remaining unexposed. The exposed portion was, in the positive film, transparent. Scratches and spots of dust on this clear portion of the film, as well as the granular structure of the film itself, gave rise to crackling and undesirable noises referred to as "ground noise" or "background noise."

To aid in preventing the objectionable features of the prior art, Poulsen shifted his median or axis line near the edge of the sound track and so arranged his structure that this line would shift toward the center of the track when sound modulation occurred, thereby eliminating ground noise during periods of no modulation. But to prevent asymmetrical distortion during periods of great sound amplitude, he placed two definite limits to the displacement of the zero line: (1) near one edge of the sound track and (2) the center of the sound track.

It will be noticed that the heart of the invention here involved is expressed in the above italicized clause of count 1.

The McDowell disclosure shows a system of sound recording in "talking movies." He discloses a somewhat different method for accomplishing his purpose, which will be more thoroughly discussed hereinafter.

■ While Poulsen's reasons of appeal raise a number of questions, it is necessary for us to consider but two of them in disposing of the case: (1) McDowell's right to make the counts and (2) McDowell's proof of priority. A number of questions raised by the reasons of appeal are not referred to in Poulsen's brief, and we conclude that Poulsen has here abandoned those issues.

The interference is between Poulsen's application filed September 17, 1931, and McDowell's application for reissue of his patent, filed April 10, 1941. McDowell's original application was filed November 8, 1930. Before the Primary Examiner, Poulsen successfully moved to shift the burden of proof and obtained the advantage of the filing date of his German application, September 26, 1930. Thus, it will be seen that Poulsen is senior to McDowell by only 43 days. McDowell's application here immediately involved is for a second reissue of his patent, which issued upon the

aforesaid application of November 8, 1930, the first reissue having been granted March 12, 1940.

■ Only McDowell took testimony, and Poulsen is confined to his record date. McDowell, as junior party, was under the burden of proving his priority by a preponderance of the evidence.

We shall first discuss and decide the question of McDowell's right to make the counts.

Poulsen urges here that neither originally nor in the first application for reissue did McDowell claim the instant invention; that he disclosed it in none of his applications; and that he claimed it only after seeing the aforesaid holding of the United States Court of Appeals for the District of Columbia directing the allowance of the three claims corresponding to the counts here involved.

Before the Primary Examiner Poulsen moved to dissolve the interference on the ground of the insufficiency of McDowell's disclosure, but the motion was denied, the examiner holding that McDowell's disclosure "does support the counts, element for element" in the manner which had been pointed out in McDowell's brief before him.

The Board of Interference Examiners likewise held on this question that McDowell's disclosure supports the counts. We quote at some length from the board's decision on this question since we think the situation is properly and clearly stated therein:

"Poulsen and Petersen used an apparatus similar to that used by Robinson and Hewlett in which the zero axis of the recording was closely adjacent the edge of the sound track at low sound levels, but in which the galvanometer was so biased that the zero axis of the recorded wave would shift upon increase in volume, but which could not pass beyond the center of the sound track, no matter how loud the sound to be recorded. Thus, if there was any over-shooting of the sound track, the cut-off would be symmetrical just as it had been in the old type of recording, yet the transparent portions of the film, which were not needed, were reduced as in Robinson and Hewlett to reduce background noise.

"McDowell uses a standard variable area recorder which is additionally provided with a shutter * * * actuated in re-sponse to the volume of the sound to be recorded. This shutter is placed in the path of the recording light and is so adjusted, when no sound is present, as to admit a beam of light five thousandths of an inch in width as against the usual thirty-five thousandths width for the normal recording system. As the volume of sound increases, the shutter will be moved to permit more light to reach the film * * *."

The board then pointed out that in the McDowell system the normally transparent areas of the sound track are blacked-out; that the zero line is always at the center of the film, with the result that any over-shooting must be symmetrical; and that McDowell accomplishes the two objectives of background noise reduction and symmetrical recording. It stated that the essential difference between the Poulsen and the McDowell methods is that in the former the zero line is caused to shift from the position near the edge of the sound track, corresponding to substantially zero average exposure, to the middle of the track, corresponding to fifty per cent average exposure, while in the latter the zero line remains fixed at the center of the track and the average exposure is varied by means of the shutter.

Then the board continued:

"It is agreed by both parties that the essential feature of novelty is expressed in the last two lines of count 1 as follows 'and holding the variations of the average exposure between predetermined lower and upper limits.' None of the counts in issue require that the zero line be varied between predetermined lower and upper limits, but only that the average exposure, which obviously is the ratio of the exposed area to the total area, be held between such limits.

"Poulsen et al. concede that McDowell discloses the lower limit required by the counts (the minimum opening of five thousands [sic] of an inch of the shutter referred to in the McDowell specification), but strenuously urge that McDowell does not refer at all to the upper limit.

"It is true that the McDowell specification does not, in so many words, state that there is an upper limit of average *density* [upon petition for reconsideration, the board changed the word 'density' to 'exposure']; however, from the very nature of his recording device there must be an

upper limit fixed either by the maximum movement of the shutter * * *, the edge of the slit * * * or the edge of the sound track, any one of which would give a maximum average *density* [changed to 'exposure' as above] of approximately 50%."

In answer to Poulsen's contention that a sound track recorded by the McDowell method could never have a straight lower edge as shown by the sample films in the McDowell brief, because the shutter trace is produced on the film in accordance with the rectified component of the sound wave, the board said:

"With the sound intensities within certain limits a wavy line * * * will be produced, but it is obvious that the shutter * * * may move to such a point, on high volume levels, that it no longer interferes with the recording beam, then the recorder operates in the same manner as the old style recorder just as does the Poulsen et al. recorder at high volume levels. The McDowell application nowhere states that the recording level must be held down to the point where the shutter will not be completely removed from the field of influence. The illustration given * * * [in] the McDowell application merely sets forth the procedure in setting the recording level for an orchestra, so that the sound will not cause the recording beam to overshoot. McDowell's testimony * * * referred to * * * [in] the Poulsen et al. brief merely refers to the setting of the recording level.

"We believe it to be clear that the upper limit of average exposure; i.e., substantially 50% is inherent in the apparatus and method disclosed by McDowell and that the counts in issue are thus supported by the McDowell disclosure, and we so hold."

█ Thus, it is seen that the Primary Examiner and the Board of Interference Examiners concurred in the view that the disclosure of McDowell supports the counts. We have given Poulsen's arguments careful consideration, but we are not convinced that the decision of the board as to the right of McDowell to make the counts was erroneous. The question involved is a highly technical one, and the familiar rule applies that where such matters are before this court on appeal, the decision of the Board of Interference Examiners, especially when it concurs with that of the Primary Examiner, will not be disturbed unless it is clearly erroneous.

The instant issue depends upon an understanding of McDowell's shutter arrangement. It is thought that it would not be helpful to reproduce here McDowell's drawings, which are diagrammatical and very poorly reproduced in the record. The details of construction of the shutter are not shown, and, for that matter, it is not urged here that the use of a shutter in the motion picture art is new; but the use of the shutter by McDowell in the particular place where it is used and for the purposes for which it is used is new. An understanding of its operation, however, sufficiently appears from the following statement quoted from McDowell's specification:

"In carrying out my invention the usual variable area sound recorder is utilized. This recorder, for instance, may be a galvanometer type utilizing a vibrating mirror actuated by the voice currents. Connected with the voice input is an amplifier and a detector for amplifying and detecting the voice currents respectively. The rectified voice currents are then utilized to operate a shutter placed in the path of the vibrating light beam for the purpose of limiting the amount of light falling upon the negative sound record to that which is necessary to permit the full fluctuation or modulation of the recording light. The shutter will move in proportion to the D. C. impulses representative of the rectified voice current, and will admit light only to the extent required by the peak modulation reaching the film at any instant. When no modulation occurs, the shutter is adjusted to admit light to the film to the extent of approximately five thousandths of an inch in width as against the usual thirty-five thousandths width for the normal recording system. It is seen by this that there will therefore remain about ten per cent of the clear portion of the film that formerly existed.

"The amount of light reaching the photo cell of the projector, therefore, operated by a positive produced by the negative produced in accordance with my invention, will be greatly reduced when there is no modulation, and the variation in light intensity due to dirt, scratches and grain structure, will be correspondingly decreased. This in turn greatly reduces the amount of ground noise."

This would seem to be a clear statement as to the manner in which McDowell accomplishes the same purposes as Poulsen. It is true, as was pointed out by the board,

that McDowell has not, in so many words, stated that he holds the variation of the average exposure between predetermined upper and lower limits, but we think it is clear that he does do so. It is obvious that there is a difference between the devices used by the two parties to accomplish the same purposes, but that difference which Poulsen has stressed is not defined in the counts here involved. It must be remembered that the counts are not limited to the variation of the axis or zero line between upper and lower limits but are drawn to the variation of the "average exposure" between such limits. In the McDowell device, the zero line is always at the center of the sound track and, as pointed out by the board, any over-shooting must necessarily be symmetrical. At most, the average exposure will not exceed 50 per cent of full exposure, which satisfies the requirement of the counts that there be an upper limit; and Poulsen concedes that McDowell discloses the lower limit required by the counts.

■ For the reasons stated, we hold that the McDowell disclosure furnishes proper support for the counts in issue.

■ We come now to the second issue, namely, the sufficiency of McDowell's proof of priority. The board has correctly and in great detail analyzed the evidence submitted on behalf of McDowell. We are fully in accord with its analysis and its conclusions as to the sufficiency of the proofs. Poulsen, however, has strenuously urged here the insufficiency of the proofs, and we deem it advisable to discuss those portions of the evidence which we think satisfactorily show that McDowell was the first inventor of the invention in issue.

McDowell was employed as a sound recorder in the RKO Studios during the years 1929, 1930, and 1931. During the latter part of 1929 he set to work on the problem of eliminating "ground noise" in the motion picture sound recording art. According to Exhibit 11, an affidavit of conception executed on February 6, 1930, and witnessed by three employees of RKO Studios, McDowell conceived, on January 31, 1930, the idea of using an electromagnetically operated shutter device, responsive to a rectified direct current component of the alternating modulating current, to mask off the clear portion of the sound track and eliminate "ground noise." One

of the subscribing witnesses, Van Hessen, testified as to McDowell's disclosure to him of the idea of using the masking shutter, fixing the date as "the period immediately after 'Hit The Deck', which was in the very latter part of 1929."

Exhibit 2 is a letter written by the witness Dreher, McDowell's superior, to Mr. LeBaron, the operating head of RKO Studios, to explain the nature of McDowell's apparatus. It is dated February 15, 1930, and was identified by Dreher in his testimony. The letter explains the principle of operation of the McDowell device, stating, in substance, that it comprises an electromagnetic shutter which cuts off the light in inverse proportion to the degree of modulation, that the shutter is actuated by an amplifier-rectifier, and that a thin beam of light is utilized when the modulation is low, while during periods of high modulation the shutter moves out of the path of the light beam. The letter refers to a film made in accordance with this method, which was given to LeBaron to take with him on a trip east to display to the RKO salesmen.

On the same date, February 15, 1930, McDowell also wrote a memorandum (Exhibit 3) to LeBaron, fully describing his device.

Dreher also identified several exhibits as being requisitions for supplies and parts to be used in constructing a device according to McDowell's invention for use in recording the sound for the forthcoming motion picture, "Dixiana." We quote the following from his testimony concerning these requisitions:

"Q26. Here are four photostats, marked for identification as Exhibit 4A, 4B, 4C and 4D. Can you explain what they are? A. These are requisitions for equipment and materials which were required for the manufacture of McDowell's anti-ground-noise apparatus.

"Q27. What signatures, if any, appear on any of the sheets? A. They bear McDowell's name as the originator of the requisitions, and my signature. I had to O. K. such requisitions before the apparatus could be bought.

"Q28. What can you say with respect to the information set forth under the heading 'description' on these various sheets. A. These requisitions covered materials which were used in the manufacture of McDowell's device for the motion

picture 'Dixiana' which was later made at RKO Studios.

"Q29. Under the heading 'description' there appears the sentence 'one such device is already existent'. What can you say with respect to this device which was apparently existent prior to the date of this requisition which is indicated as February 25, 1930? A. The original model of McDowell's device had already been built and used in recording tests at that time.

"Q30. What sort of recording tests? A. We made tests on speaking voices and also on singing voices. Specifically, one on the vocalist named Everett Marshall.

"Q31. Do you recall what your conclusions were with respect to those tests? A. As a result of those tests, we were convinced that the McDowell device greatly reduced ground noise and had merit in improving recording quality."

Dreher's further testimony, in describing what he meant by the "McDowell device" shows that he thoroughly understood the construction and operation of the invention.

Exhibit 7, dated April 30, 1930, is a document prepared by McDowell setting out the technical aspects of his invention. It was drawn up for use in making application for a patent, and the information contained therein corresponds substantially to that set forth in the specification of his patent application. It is stated in the document that the system described therein was used in recording the sound for the picture "Dixiana (recorded March 24–April 26, 1930)". This exhibit was signed by McDowell and witnessed by Dreher. The board, in this connection, stated that Exhibit 7 "does not come within the objection of self-serving statements * * * as it appears that Dreher was working along with McDowell, and nothing appears in the record that Dreher derived his knowledge of the contents of Exhibit 7 and the events, as to which he testified, from conversations with, or reports from McDowell, rather than from actual knowledge of events."

Attached to Exhibit 7 and designated as "Fig. 1" is a schematic sketch showing the wiring diagram for the amplifier-rectifier and shutter mechanism used by McDowell. In all material respects, this sketch closely corresponds to that portion of the patent drawing showing the amplifier-rectifier unit and shutter mechanism. The principal difference is in the location of a milliam-

meter, which, of course, is merely a current indicator device. Poulsen's counsel states in his brief that "Exhibit 7 is admitted by McDowell to be an incorrect sketch of a circuit and no one has testified that any of the allegedly numerous 'reductions to practice' was made from this drawing." McDowell's testimony in connection with the said drawing was that there was one correction to be made, that the drawing was made hurriedly and for that reason he used an "X" to represent a milliammeter "shown on the lower left-hand corner of the drawing, in the leg of the bucking battery to ground, whereas it should have been put between the voice coil shown on the left and the terminal of the ground connection and the bucking battery", that with the correction stated the device was connected and operated at all times, and that the function of the two meters was "to show the amount of current on either side of the center tap of the voice coil, and indicated alternately as each voice coil operated." We think the change described was merely of a minor and inconsequential character.

McDowell testified that he personally constructed the shutter and shutter motor. The witness Pratt, a repair and maintenance man, testified that on McDowell's instructions he built the amplifier-rectifier unit and stated that the sketch of Exhibit 7 was quite similar to the sketch given him by McDowell, which Pratt later lost, and which he followed in building the said unit. Pratt also identified Exhibits 12A and 12B as being photographs showing the amplifier unit and meter box which he built and one of the shutters used with the system, and he testified that the apparatus shown in the photographs was used in recording the sound of "Dixiana."

The witness Van Hessen also identified the photographs Exhibits 12A–12C as representing "an early McDowell shutter" and the amplifier and meter box used in connection therewith. He stated that he was the recordist on the picture "Dixiana," that the McDowell shutter device was used in recording the sound for that picture, and that he was responsible for the adjustment of the shutter during that production. He also testified that the McDowell shutter device was used in recording the sound for the movie "Half Shot at Sunrise," produced shortly after "Dixiana." Other witnesses testified that the McDowell device

was used in the recording of both "Dixiana" and "Half Shot at Sunrise."

According to the stipulated testimony of Sidney Kramer, manager of the print department of RKO, prints from the picture negative and sound track of "Dixiana" were released and distributed to theatres during August of 1930, and prints of "Half Shot at Sunrise" were similarly released and distributed in September of that year—both prior to Poulsen's record date of September 26, 1930.

Exhibit 14, according to the stipulated testimony of A. R. Ulmer, laboratory contact man for the recording division of RCA Manufacturing Co., Inc., is a roll of film on which are recorded various portions of the sound tracks of the two movies "Dixiana" and "Half Shot at Sunrise." This film was run off in a projection room during the taking of testimony, and McDowell and the witnesses Van Hessen and Aalberg, the latter a sound director for RKO Studios, testified that they recognized the sound as parts of the sound records of "Dixiana" and "Half Shot at Sunrise." The board placed considerable reliance upon this exhibit in its decision, and both parties have here argued at length regarding what weight should be given it in deciding the question of priority. We find it unnecessary to consider this exhibit or the testimony concerning it in deciding the issue. There is an abundance of fully corroborated testimony and exhibits herein referred to which support the conclusion reached by the board, and we will not give consideration to the importance or lack of importance of Exhibit 14.

Poulsen has made much of the contention that McDowell introduced no drawings of his device and that his documentary proof is insufficient. The board in this connection stated that—

"It is not necessary that documentary evidence be presented to support the material allegations of the witnesses. It is well recognized that individuals can recall events with greater ease than the time when the events occurred [sic]. A number of witnesses recalled that McDowell's shutter was used in recording 'Dixiana,' and nothing appears of record to discredit these assertions; nor is it denied that 'Dixiana' was used commercially before the date available to Poulsen et al. for conception and reduction to practice."

Furthermore, the sketch of Exhibit 7 was shown to the witness who constructed the amplifier-rectifier unit, and he stated that the sketch corresponded substantially to the layout and wiring of that unit. And, as before stated, that sketch substantially conforms to that portion of the patent drawing directed to the heart of McDowell's invention, i.e., the shutter mechanism and its related amplifier-rectifier unit. It must be remembered that the McDowell invention was merely an improvement to be adapted to and used in conjunction with standard and well-known recording systems, old in the art. The witness Dreher pointed out in his testimony that McDowell "did not build a complete recorder. McDowell built only the anti-noise adjunct, and it was definitely an adjunct which could be used only in connection with a standard variable area recording channel. Without a recording channel you could not have used it." That being the case, it was not necessary that McDowell make complete drawings such as appear in the patent application. It was quite clear to the witnesses, who were experts in the art, how the shutter device (operated electromagnetically) would be used in conjunction with the standard recording systems, and, in fact many of them did actually see it in operation as an adjunct to the old variable area recorder.

There are other circumstances, probably of less importance than those to which we have referred, which aid in supporting the conclusion we have herein reached on this phase of the case. However, we think it unnecessary to unduly extend this opinion by discussing them in view of the weight we have given to the hereinbefore pointed out phases of the record. Contrary to the argument of Poulsen, we think that there is an abundance of pertinent documentary proof, to much of which we have already referred. We do not think it is open to question, in view of all the evidence both documentary and testimonial, that McDowell successfully reduced to practice prior to Poulsen's record date.

In many instances the absence of a drawing or a working model first used in reducing an invention to practice is a consideration of vast importance. This is true when the oral testimony lacks the element of being convincing proof. In the instant case, however, the absence of such indicia stressed by Poulsen is satisfactorily ex-

plained, and in its absence the proof would seem to be sufficient to convince any reasonable mind, having first arrived at the conclusion that the counts read on McDowell's original disclosure that McDowell had fully reduced to practice the invention defined by the counts prior to the record date of Poulsen. In view of such conclusion, the question of diligence is of no importance.

But one matter remains for our consideration. A motion by McDowell to correct diminution of the record was allowed, and pages 145 to 189 were added subject to the taxation of costs. We find that the added material was not necessary to our decision and has not, in fact, aided us in deciding the issues. So far as we can determine only one casual reference was made to such material in McDowell's brief. The costs of the added material will therefore be taxed against McDowell.

For the reasons hereinbefore stated, the decision of the Board of Interference Examiners is affirmed.

Affirmed.